**In the Matter of Sol Z. ROSEN, Respondent.**

**No. M–121–82.**

District of Columbia Court of Appeals.

Argued Jan. 20, 1983.

Decided Dec. 6, 1983.

David Epstein, Washington, D.C., with whom Thomas W. Farquhar, Washington, D.C., was on the brief, for respondent.

Wallace E. Shipp, Jr., Asst. Bar Counsel, Washington, D.C., with whom Fred Grabowsky, Bar Counsel, Washington, D.C., at the time the case was argued, was on the brief, for the Board on Professional Responsibility.

Before KERN, NEBEKER, and FERREN, Associate Judges.

FERREN, Associate Judge:

Respondent practices criminal defense law, usually representing indigent criminal defendants in Superior Court. He is before this court as a result of complaints filed by two indigent defendants primarily alleging neglect and intentional failure to seek lawful client objectives. The complaints arose out of two unrelated incidents and were considered by separate Hearing Committees, then consolidated by the Board on Professional Responsibility in its Report and Recommendation to this court. Adopting both Hearing Committees' findings of fact, the Board concluded that respondent had violated DR 4–101(B)(1),[1] DR 6–101(A)(3),[2] and DR 7–101(A)(1)[3] of the Code of Professional Responsibility. The Board considered respondent's prior disciplinary history and the seriousness of the violations involved here, and recommended that we suspend respondent from the practice of law for three months.

Respondent objects to the Board's findings and conclusions on grounds of insufficiency of the evidence and due process. He further contends that the recommended sanction is disproportionate to any wrong on his part, and urges that, in the event we adopt the Board's conclusions as to Code violations, we impose a period of supervised probation in lieu of suspension.

We conclude that the Board's findings and conclusions are supported by substantial record evidence, but we cannot accept its proposed sanction of three months' suspension. We order instead a six months' suspension.

## I. Foggie/Rosen

### A. Statement of Facts

The first complaint against respondent rests on substantially undisputed facts. In the pre-dawn hours of September 13, 1980, the police arrested Eugene Foggie for the attempted larceny of a camper top. He was taken to Superior Court, where a representative of the Pre-Trial Services Agency interviewed him. The Agency reported that Foggie had no fixed address and no full-time employment, that he was addicted to heroin, and that he had three prior convictions. The report also indicated that Foggie had lived in the District of Columbia all of his life, that he had family in the area, and that he earned money by doing odd jobs. The Agency, however, was unable to verify any of this information. According to the report, moreover, a representative of the Agency contacted the defendant's stepfather, who said that he would not allow Foggie to live with him.

Foggie testified that respondent spoke with him in the cell block shortly after his interview with the Pre-Trial Services Agency. Respondent asked him no questions about his background: "He [respondent] just said that we were going before the judge and then ... I think that was it." The entire interview lasted three to four minutes.

Respondent gave a different account of his contacts with his client on the morning of the arraignment:

> After being advised of the appointment by the Criminal Justice Act Office ... I went down and spoke to Mr. Foggie and advised him fully of the nature of the case ... I spoke to him about his back-

---

**1.** DR 4–101(B)(1) provides that a lawyer shall not knowingly "[r]eveal a confidence or secret of his client."

**2.** DR 6–101(A)(3) provides that a lawyer shall not "[n]eglect a legal matter entrusted to him."

**3.** DR 7–101(A)(1) provides that a lawyer shall not intentionally "[f]ail to seek the lawful objectives of his client through reasonably available means...."

ground such as criminal record, residence, jobs, things of that nature.

I advised him fully of his legal rights, what would happen that day. The fact that the case was a misdemeanor, would be continued for the purpose of the status and this going to trial and that we would make efforts to try to have him released on bail, depending on the recommendation of the pretrial services.

My recollection is that the bail agency's report came out later that morning about twelve o'clock. I went back to the cell block ... and I showed it to Mr. Foggie, and advised him that because of the lack of verification, any information he had, the bail agency did not recommend personal bond, and almost every case they do recommend some sort of conditions of release.

At the arraignment, the following exchange took place:

THE COURT: Mr. Rosen, what do you have to say given the Bail Agency information?

MR. ROSEN: Your Honor, I read the report, other than the fact that I'd ask the court to set a reasonable bond since none of the information can be verified.

THE COURT: All right. At this time there will be a $500 cash or surety bond.

Unable to make the bond, Foggie was incarcerated. Foggie testified, without contradiction from respondent, that he telephoned respondent from jail to request that respondent file a bond review motion, and that respondent agreed to do so. He further testified, still without contradiction,

that "[w]hen I first talked to him, he told me he would [file a bond review motion] then after a few days had passed and I hadn't heard from him, I made another call and he hung up on me." Respondent admits that he never filed the motion.

Respondent next met with his client on October 10, 1980, the day of the status hearing. According to the findings of the Hearing Committee as adopted by the Board, at this meeting "[respondent's] contact with his client centered on his attempts to have his client enter a plea of guilty on that day."

At the status hearing, respondent proffered to the court that his client wished to plead guilty. The court asked Foggie whether it was his intention to plead guilty, and Foggie replied: "Well, Your Honor, the situation is where I was, it was a misunderstanding, you know, about what was—that I could have the property. And then when I went to remove it ...." The court interrupted the proceedings and suggested that respondent confer with his client. According to respondent's testimony at the hearing, he then advised Foggie as follows:

I told him that what he said, that permission from the third party that he didn't know, other than he said someone told him he could take it, would not be a valid defense in the eyes ... in other words, would not be a valid defense, would not be a successful one.

The hearing resumed. The trial court explained the elements of attempted petit larceny and asked Foggie if he admitted to each element.[4] The court refused to accept

---

4. THE COURT: ... Basically, the elements of this offense are: one, that you tried to take and carry away some property ... of some value .... That you didn't have a right to do that. And further that you attempted to take and carry this away forever. Now, you seem hesitant, and that's why I'm going through this. Did you do this or did you not. Did you try to steal a camper top?

MR. FOGGIE: Well, I was told by someone that I could have it because it was going to be disposed of, that and a couple of more vehicles there. Then when I went to remove it, the

people came out and claimed it. So I put it back.

MR. ROSEN: May I suggest you ascertain if the owner gave him permission to take it?

THE COURT: Yes, I understand. You didn't talk to the owner?

MR. FOGGIE: No, I didn't.

THE COURT: Do you know what steal means?

MR. FOGGIE: Yes, Your Honor.

THE COURT: Were you trying to steal something?

MR. FOGGIE: That wasn't my intention.

the plea when Foggie again asserted he believed he had permission to take the camper top.

On October 27, 1980 respondent moved to withdraw from the case. The trial court granted the motion and appointed new counsel to represent Foggie. The Hearing Committee found that on November 10, 1980, Foggie's new counsel filed a bond review motion, and that on November 13 the trial court released Foggie on personal recognizance in the third-party custody of Stepping Stones pending trial.[5]

## B. The Board's Findings

The Hearing Committee found, and the Board agreed, that respondent's performance fell short in that he failed to seek his client's pre-trial release, failed to communicate with his client, failed to conduct meaningful discovery of his client's case, and failed adequately to prepare his client for the plea discussion. In reviewing disciplinary proceedings, this court "shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record." D.C.Bar.R. XI § 7(3). The Board's findings in this case are amply supported by the record, and we agree with the Board's conclusion that respondent violated DR 6–101(A)(3) and DR 7–101(A)(1) (*supra* notes 2 and 3, respectively).

THE COURT: I won't accept the plea in this case.

5. In his brief and argument to the Board, respondent contended that the Committee was mistaken in this finding, and that the court had *sua sponte* ordered Foggie's release. The Board, apparently accepting respondent's contention, observed:

Although the Committee did not base its findings concerning respondent's conduct on the fact of Mr. Foggie's subsequent release, the ease with which the release was eventually obtained does suggest that it could have been accomplished sooner. The emphasis respondent places upon the lack of effort required to obtain the release is curious.

6. The 1981 D.C.Code carries forward verbatim D.C.Code § 23–1321 (1973), the statute in effect at the time of Foggie's arrest.

## C. Pre-Trial Release: Statutory Protections Afforded the Accused.

We begin with an analysis of respondent's most serious default, his failure to seek Foggie's pre-trial release. The standards governing pre-trial release in non-capital cases are set out in D.C.Code § 23–1321 (1981).[6] Section 23–1321(a) provides that an accused

shall, at his appearance before a judicial officer, be ordered released pending trial on his personal recognizance or upon the execution of an unsecured appearance bond ... unless the officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required or the safety of any other person or the community.

If the judicial officer determines that an unconditional release is inappropriate, then he or she may impose one or more conditions on the accused's release. *Id.,* § 23–1321(b).[7] The statute sets forth a list of conditions—third party custody, restrictions on travel, payment of an appearance bond, payment of a bail bond or cash, overnight custody with daytime work release—and provides that the judicial officer must impose the first condition or set of conditions on the list that will adequately assure the accused's presence at trial and the safety of the community, although "no financial condition may be imposed to assure the safety

7. D.C.Code § 23–1321(b) (1981) lists factors for the officer to consider in setting pre-release conditions:

In determining which conditions of release, if any, will reasonably assure the appearance of a person as required or the safety of any other person or the community, the judicial officer shall, on the basis of available information, take into account such matters as the nature and circumstances of the offense charged, the weight of the evidence against such person, his family ties, employment, financial resources, character and mental conditions, past conduct, length of residence in the community, record of convictions, and any record of appearance at court proceedings, flight to avoid prosecution, or failure to appear at court proceedings.

of any other person or the community." *Id.* § 23–1321(a).

The statute, by its terms, thus establishes a presumption in favor of unconditional release, and, where unconditional release is inappropriate, requires the court to impose the least onerous set of restrictions that will adequately assure appearance and safety. *Clotterbuck v. United States,* 459 A.2d 134, 135 (D.C.1983); *Jones v. United States,* 347 A.2d 399, 401 (D.C.1975); *Bouknight v. United States,* 305 A.2d 524, 526 (D.C.1973) (separate statement by Nebeker, J.).

If an accused is unable to meet conditions of release within 24 hours of their imposition, the statute affords him or her the right, upon motion, to have those conditions reviewed.[8] If, as here, the trial court initially imposes a cash or surety bond, and the bond review motion requests release into third-party custody, then the court must either accept the custody proposal or justify its rejection on the record. *Clotterbuck, supra,* 459 A.2d at 135; *Ireland v. United States,* 406 A.2d 1259, 1260 (D.C. 1979). Denial of a bond review motion is appealable to this court. D.C.Code § 23–1324(b) (1981).

The statutory scheme outlined above has constitutional underpinnings. The elaborate procedural safeguards built into the statute reflect the legislature's recognition that pretrial release is very important.

Any form of pretrial incarceration infringes on an accused's liberty interest in a powerful and obvious manner. *United States v. Edwards,* 430 A.2d 1321, 1333–34 (D.C.1981) (en banc). It is against this backdrop that respondent's performance must be reviewed.

D. Pre-Trial Release: Respondent's Failure to Assert His Client's Rights Under the Statute.

Respondent testified at the hearing that he was "fully" familiar with D.C.Code § 23–1321 (1981). He concedes, however, that he did not argue in favor of pre-trial release at the arraignment. He did nothing to highlight those parts of the Pre-Trial Services Agency report that militated in favor of release—Foggie's lifetime residence in the District, his family ties here, his previous history of showing up at court. *See* D.C.Code § 23–1321(b) (1981) (quoted *supra* n. 7). Instead, he asked the court for a reasonable bond, "since none of the information can be verified." The court set a $500 cash or surety bond "[a]t this time."

Respondent then failed to take even the most obvious steps to verify the favorable information. He admitted at the hearing that he had made no attempt, either before or after the arraignment, to contact members of Foggie's family who lived in the area.[9] Nor had he explored the possibility

**8.** D.C.Code § 23–1321(d) (1981) provides:

A person for whom conditions of release are imposed and who, after twenty-four hours from the time of the release hearing, continues to be detained as a result of his inability to meet the conditions of release, shall, upon application, be entitled to have the conditions reviewed by the judicial officer who imposed them. . . .

Once a bond review motion is filed, a separate statute requires the Pre-Trial Services Agency to review and, if appropriate, supplement its report:

D.C.Code § 23–1303(b) (1981):

With respect to persons seeking review under subchapter II of this chapter of their detention or conditions of release, the agency shall review its report, seek and verify such new information as may be necessary, and

modify or supplement its report to the extent appropriate.

**9.** Q. Did you call any of the relatives, his stepfather?

A. He gave me no information on any of these people.

Q. You knew the bail agency had talked to his stepfather?

A. And according to their report, they said he couldn't live there.

Q. Did you call then?

A. No, I did not.

Q. Did you call him as an advocate to say, listen, he's going to be locked up, would you take him in?

A. No the bail agency verified that he couldn't stay there.

Q. But that didn't stop you from calling and trying to change his mind?

of some form of custodial arrangement,[10] despite the fact that D.C.Code § 23–1321(a) (1981) expressly provides for such an arrangement. *See Jones, supra,* 347 A.2d at 401 ("Third party custody is the first and preferred condition of release to be used in conjunction with or in lieu of personal recognizance"). Finally, it is undisputed that respondent did not file a bond review motion, despite his client's inability to raise $500 bond and his client's uncontradicted testimony that respondent agreed to file the motion.

Respondent defends his actions as tactical decisions, arguing in his brief on appeal that, in light of the Pre-Trial Services Agency's recommendation against Foggie's release, he cannot be held to have neglected his client for failing to "advance essentially foolish arguments about 'his client's likelihood of appearing for future Court dates,' his 'ties to the community such as family, employers, and lengthy residence,' and 'possible third party [custodians],'" or because he "did not file a bond review motion upon these same facts after 24 hours" (quoting Board's Report). He contends that he was "well within his discretion in deciding that no bond review should be filed" because "Mr. Rosen's experience in these matters has given him a sixth sense, an acute sense of relevance."

We find these arguments meritless. An attorney is—or should be—more than a bro-ker. In agreeing to represent Foggie, respondent assumed a duty to do more than passively accept a negative recommendation from the Pre-Trial Services Agency.[11] Respondent assumed a duty to act as an advocate. The Board found he neglected that duty because, having asked for a low bond on the ground that the information favoring release had not been verified, and having later ascertained that his client could not raise even a nominal bond, he let the matter drop.

The fact that bail was later reduced is of particular relevance. If the defendant was clearly not fit for bail reduction, counsel's failure to pursue release (in the absence of an agreement to do so) could be excused; for we should not require counsel, under pain of discipline, to file motions contrary to their sound professional judgment. *Cf. Jones v. Barnes,* —— U.S. ——, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (defense counsel appointed to prosecute appeal of criminal conviction does not have constitutional duty to raise every nonfrivolous issue requested by defendant). Foggie's undisputed testimony, however, establishes that respondent not only neglected his client's interest in pretrial liberty when there was information favorable to release (as yet unverified), but also compounded his neglect by promising to file the bond review motion and then failing to do so. By arguing that his failure to file the motion was the result of a tacti-

---

A. No, it didn't, but there already had been a call and it had already been determined that he couldn't stay there.

10. Q. Now, [at the arraignment] you made no argument . . . about a possible Half-Way House placement of him, did you?
A. There was no recommendation, in fact, I don't think the Half-Way House program was in effect as it is now.
Q. The Half-Way House was not available, the Department of Correction Half-Way House under § 1321 was not available?
A. I honestly don't recall whether it was.
Q. You made no recommendation about possible RCA [Rehabilitation Center for Alcoholics] placement since he had an alcohol and drug problem?
A. I only had information of a drug problem, not alcohol.

Q. Well, you didn't check to see whether he could go to Occoquan, Virginia?
A. No, I didn't.
Q. And you didn't check to see whether Stepping Stones would accept them into their third-party custody, did you?
A. I don't believe that Stepping Stones was in court that Saturday.
Q. Did you check on Monday to see whether Stepping Stones . . .
A. I checked the numbers he gave me to verify information about him that he . . . to find out some information about him.

11. We note that, had respondent filed a bond review motion, the Agency would have been required to reconsider its initial evaluation. See note 8 *supra.*

cal decision, respondent in effect concedes that the failure was deliberate and thus the kind of willful abandonment proscribed by DR 7–101(A)(1). *In re Smith,* 403 A.2d 296, 298 (D.C.App.1979).[12]

### E. Respondent's Failure to Seek Discovery

The Hearing Committee found, and the Board agreed, that respondent "did not obtain any meaningful discovery." The Assistant United States Attorney responsible for supervising misdemeanor trials testified at the hearing that his office had a policy of requiring its attorneys to make notations in a case file when they give discovery to defense counsel. The file on Foggie's case disclosed no discovery to respondent.[13] The Assistant responsible for prosecuting Foggie testified that at the status hearing on October 10, 1980, she made a point of stating on the record that Foggie had made statements to the police: "I was particularly concerned with bringing this to the Court's attention and stating it on the record because I knew no discovery had been given and I did not want the defense to be taken by surprise when we attempted to introduce these statements at trial."

Respondent testified that he thought he had spoken with the Assistant United States Attorney responsible for preparing the charges. The Assistant testified that he did not remember giving respondent any discovery, and that he would have made a note in the files if he had.

Respondent called as a witness a fourth Assistant United States Attorney, who had no connection with the Foggie case, but testified that it was his practice and the practice of other Assistants to give "informal discovery" without noting it down. When asked by Bar Counsel whether "many

[defense] attorneys rely upon that as their entire discovery," the witness replied: "I wouldn't think so . . . ."

This record amply supports the Board's finding that "[r]espondent failed to obtain discovery of the prosecutor's case which would have enabled him to evaluate its strength, ascertain the conditions for any plea bargain and thus intelligently advise his client of the best course of action."

### F. Communication with Client/Handling of the Plea Agreement

The Hearing Committee found, and the Board agreed, that at the time of the status hearing "[r]espondent had yet to discuss the case with his client . . . and was committed to the plea." The Board added that "[r]espondent ingenuously confirms that he was committed to a guilty plea and was making the decision for his client in his brief to this Board. 'Confronted with an unruly client whose story was hardly credible,' *respondent decided* to plead him guilty at the status hearing . . . ." (emphasis added by Board) (quoting Respondent's Brief to the Board). Finally, the Board found that respondent persisted in his decision to plead his client guilty

> even after he was clearly apprised of his client's asserted defense. Respondent made his decision because then and now he considered his client's decision a "sham." Only the intervention of the Court prevented respondent's decision, adverse to his client and made without benefit of investigation, discovery or client communication, from resulting in the conviction of his client.

The testimony summarized in Part I.A., *supra,* provides substantial evidence in sup-

---

**12.** Respondent's argument that the Board misapplied the standard of DR 7–101(A)(1), because he "was not obliged to pursue a virtually hopeless objective of his client," is therefore misplaced. The statute gave his client the right to have the bond condition reviewed. The Pre-Trial Services Agency's report recommending against release contained unverified information militating in favor of release. The client asked respondent to file a bond review motion.

He promised to file the motion. He did not file the motion. His claim that the motion would have been unsuccessful is not a defense to the charge of willful abandonment.

**13.** The file indicated that another attorney—apparently respondent's successor—did receive discovery.

port of these findings, and we hereby accept them. D.C.Bar R. XI § 7(3); *Smith, supra,* 403 A.2d at 302.

### G. Respondent's Insufficient Evidence Argument

Respondent contends in his appellate brief that even if the acts and omissions of which the Board found him guilty would constitute neglect on the part of some other lawyer, the Board had insufficient evidence to find him, a "street crimes practitioner," in violation of DR 6–101(A)(3). He argues that the Board's neglect standard "must take into consideration the nature of the practice" and "must be reasonably related to the available economic resources." We are told that because a "street crimes practitioner" cannot afford the technology or support staff of a large law firm, the Board and this court must defer to his or her "educated judgment."

We cannot accept this argument. First of all, notwithstanding respondent's effort to portray it as such, this is not a case in which the Board faulted a lawyer for failing to log the same hours for an indigent client that he would have logged for one with infinite resources. This is a case in which the Board found that a lawyer fell below the minimum standards required of defense attorneys in this jurisdiction because he allowed his "educated judgment" to be clouded over and, in the words of the Board's Report, "lost sight of his duties as an advocate for the defendant and confused his role with those of the prosecutor and the Court." In any event, "the District of Columbia has only one Code of Professional Responsibility which applies equally to all lawyers, regardless of their specialties." *In re Roundtree,* 467 A.2d 143 at 147 (D.C.App. 1983).

### H. Due Process

Respondent argues, for the first time before this court, that the Board's standard in neglect cases is so unclear that "attorneys in the street crimes practice . . . are not on notice as to what constitutes neglect," and that the standard, therefore, violates due process. He urges that the Board should have conducted hearings, "formulated guidelines, and given detailed prescriptions as to what is minimally expected . . . on recurring questions of bond review motions, discovery, attorney-client communication, and guilty pleas." [14]

While we perhaps might otherwise have rejected this argument, *see Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), our review of the record indicates that respondent did not ask the Board to hold such hearings. Nor did he complain, either to the Hearing Committee or to the Board, that he was not on notice as to the conduct the Code demanded of him. Accordingly, he has waived his right to argue lack of notice to this court. *In re James,* 452 A.2d 163, 167–70 (D.C.1982).

### II. Jae/Rosen

We summarize the facts of this case, as found by the Hearing Committee:

On November 12, 1980, Leslie G. Fein, Esq., accepted a court appointment to represent Anthony Jae, who was in the District of Columbia Jail awaiting trial on charges of assault with a dangerous weapon, possession of a prohibited weapon, and a violation of the Bail Reform Act. On March 16, 1981, respondent visited Jae at the request of a member of Jae's family. The purpose of the interview was to determine whether Jae would retain respondent instead of Fein as his lawyer in his upcoming trial. At the meeting, Jae revealed to respondent that he intended to rely on the defense that his brother—who greatly resembled him and who had died since the assault—had committed the crime. Respondent testified that he proposed to Jae a fee of $1,500, that Jae agreed to the proposal, and that Jae authorized him to reveal the defense to the prosecution. Jae testi-

---

14. We note that this argument appears inconsistent with the preceding one. Respondent attempts to argue, on the one hand, that the Board must alter its standard to accommodate his style of practice and, on the other hand, that the Board has no standard whatsoever.

fied that he told respondent he did not have $1,500, and that respondent gave Jae a business card and told him to contact respondent if he changed his mind. Jae testified unequivocally that he neither retained respondent nor authorized respondent to act on his behalf. The Hearing Committee resolved this dispute in favor of Jae, finding that Jae did not consent to any disclosure of Jae's defense to the government.

A day or two after the interview, respondent met the Assistant United States Attorney responsible for prosecuting Jae. Respondent told the Assistant that he might be entering Jae's case, and that Jae would offer witnesses to show that his deceased brother committed the assault. The Assistant United States Attorney had not previously been aware of this defense. Respondent said that he would like to proffer the witnesses to the Assistant in an attempt to persuade him to dismiss the charges. The Assistant replied that he was so confident of his case that he was not interested in interviewing Jae's witnesses. The Assistant did not use the information divulged by respondent in the preparation or presentation of the government's case.

The Hearing Committee found, and the Board agreed, that respondent knowingly revealed the confidence of a client, in violation of DR 4–101(B)(1) (*supra* note 1). Respondent's sole argument to this court is that the Hearing Committee should not have credited Jae's testimony over his, and that the fact the Hearing Committee did so "suggests that the Hearing Committee developed an antipathy to [respondent's] personality which encouraged them to reach an unfavorable resolution of the credibility issue." Appellant cites nothing to support his attack on the integrity of the committee and its decision-making process, and our independent review of the record turns up not a shred of evidence that would help him.[15]

Substantial record evidence supports the Board's conclusion that respondent violated DR 4–101(B)(1).[16]

### III. Sanction

■ The Board noted that respondent had been disciplined twice before in the District of Columbia[17] and recommended that he be suspended from the practice of law for three months. In lieu of that recommendation, respondent has submitted to this court a proposal for a period of super-

15. We note the record indicates that the Hearing Committee, in resolving the credibility issue, relied heavily on respondent's own testimony and on undisputed facts. In particular, the Committee found "most persuasive" the fact that respondent did not act as though Jae had retained him, *i.e.*, he opened no file, conducted no investigation or discovery, and did not attempt to continue the trial date which was only three weeks after the interview. In the words of the Hearing Committee Report, "Putting completely to one side the question of the demeanor of the two witnesses, ... the objective conduct of the Respondent Rosen between March 16 and April 3 was not consistent with his assertion that he had been formally retained at the March 16, 1981 meeting .... Having found that the Respondent Rosen was not retained at the March 16, 1981, jailhouse interview, the committee finds *a fortiori* that the Respondent Rosen was not, as he claimed, authorized to disclose the nature of the Complainant Jae's defense ...."

16. This result is not inconsistent with *James, supra,* 452 A.2d 163, in which we held that an

attorney's good faith was not a defense to a violation of DR 5–104(A), which proscribes a lawyer from

> enter[ing] into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of his client unless the client has consented after full disclosure.

In *James,* we distinguished DR 5–104 from Disciplinary Rules such as DR 4–101(B), containing "explicit scienter standards." 452 A.2d at 167. We do not interpret this case as holding that a lawyer must be shown to have acted in bad faith before he or she can be found in violation of DR 4–101(B). We agree with the Hearing Committee that the scienter requirement of DR 4–101(B) is one of general, not specific, intent.

17. Respondent received an informal admonition for failing to carry out a contract of employment and a public reprimand for falsely certifying the date on which he had mailed a legal document.

vised probation. He urges that his deficiencies "can be grouped under the generic term—'lack of management skills' "—and, therefore, that "his conduct can be more readily remedied by retraining rather than suspension . . . ."

Respondent did not submit this proposal to the Board. We believe it would be inappropriate for us to consider it in the first instance, for we are not equipped to decide, on the basis of a cold record, whether respondent's proposed training program would address concerns of the Board. Furthermore, lawyer training programs abound in the District of Columbia through bar-sponsored programs of continuing legal education. An attorney who is concerned about his or her ability to carry out professional responsibilities can be expected to attend such courses.

In any event, the Board found respondent guilty of poor judgment, not poor management. That, to us, is the issue. Accordingly, we consider only the Board's recommended three-month suspension.

Rule XI § 7(3) of our Rules Governing the Bar provides that this court "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." Thus, "[o]ur review of the Board's recommended sanction is limited." *In re Alexander*, 466 A.2d 447, 452 (D.C.1983). We must "respect the Board's sense of equity in these matters," and will refuse to impose its proposed sanction only if the Board abuses its discretion. *In re Haupt*, 422 A.2d 768, 771 (D.C.1980) (per curiam). On the other hand, "[w]ithin the limits of the mandate to achieve consistency, each case must be decided on its particular facts." *Id.* As this court recently concluded in *Roundtree, supra*, we conclude here that the Board-recommended sanction is inadequate.

In *In re Stanton*, 470 A.2d 272 (D.C. 1983) (*Stanton II*), we suspended the respondent from the practice of law for a year and a day based both on neglect, DR 6–101(A)(3), and on intentional failure to seek the client's lawful objectives, DR 7–101(A)(1), in two cases in which the respondent had been appointed counsel under the Criminal Justice Act. In one case, we sustained the Board's findings that "respondent failed to file a bond review motion when requested to do so by his client; failed to communicate in any significant fashion with his client; failed to investigate the facts of his client's case." At 275. In the other case, we agreed with the Board that "in direct contravention of his client's often-repeated desire to plead guilty, respondent refused in open court to take any affirmative action to further his client's desires in the matter ... [and] stubbornly refused to give his client even minimal assistance in entering his plea." At 276.[18]

In suspending attorney Stanton for a year and a day, we adopted the Board's summary of this particular lawyer's defaults: he "arrogates to himself the role of decision-maker in his representation of his clients"; he keeps "his clients largely in the dark about the progress of their cases"; he exhibits an "arrogant and abusive manner towards his clients"; and he "does not seem to have the slightest doubt about the correctness of his behavior in routinely overruling his client's judgments." *Stanton II, supra*, at 278, 279.

We elaborate from *Stanton II, supra*, to show the high water mark to date in this court's discipline in the context of neglect

---

**18.** In arriving at its recommended sanction, the Board took into account that previously it had recommended a 60-day suspension for respondent Stanton's actions in two other criminal cases: in one, a refusal to file a bond review motion requested by his client, as well as a refusal to assist his client in making a guilty plea, both in violation of DR 7–101(A)(1); in the other, a failure to obtain discovery, otherwise investigate, and keep the client informed of the progress of the case. This court adopted the Board's recommendation, *In re Stanton*, 470 A.2d 281 (D.C.1981) (*Stanton I*), ordering a 60-day suspension to be served concurrently with the year and a day suspension in *Stanton II, supra*.

and wilful failure to carry out the client's objectives in the context of criminal representation.[19] In contrast, we recently imposed a three-month suspension for two cases of neglect in criminal representation, one of which, as in the Foggie case, resulted in the unnecessary prolonging of the client's incarceration. *In re Alexander, supra,* 466 A.2d at 449.

The present case reflects conduct less egregious, in fewer client representations, than in *Stanton II, supra.* See note 18 *supra.* Respondent Rosen's conduct, however, is similar to some of the actions, and inactions, found deplorable in *Stanton II, supra.* Rosen's conduct also includes breach of a client confidence. And all of Rosen's defaults took place after he had been issued an informal admonition and a public reprimand on two prior occasions. See note 17 *supra.* Moreover, we deem Rosen's conduct more serious than the neglect and other conduct in *Alexander, supra,* where there was no finding of intentional failure to carry out client objectives.

Under the circumstances, we conclude that a six-month suspension is warranted. Because we give "due weight to the Board's expertise and, of considerable significance, to the Board's opportunity to observe demeanor," *In re Sheehy,* 454 A.2d 1360, 1366–67 (D.C.1983) (Ferren, J., dissenting), and because respondent here did not exhibit the arrogance and defiance of his ethical responsibilities found in *Stanton II, supra,* we do not believe a sanction any further beyond the Board's recommendation of a three-month suspension would be appropriate.

Accordingly, we order respondent's suspension from the practice of law for a period of six months, effective thirty days from the date of this decision.

*So ordered.*

KERN, Associate Judge, concurring and dissenting:

D.C.Bar R. XI § 7(3) provides that we must accept the Board's findings in disciplinary cases "unless they are unsupported by substantial evidence of record." I cannot say the Board's meticulous findings in this case are unsupported by substantial evidence; to the contrary, the evidence in support of such findings is quite substantial and so I concur in the court's acceptance of the Board's findings.

The Board has recommended suspension for three months, whereas the majority concludes six months is appropriate. Pursuant to our Rule, we can reject the Board's recommended disposition only if it "would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." I am not persuaded that the suspension of respondent for three months is at all inconsistent with the Board's action in comparable disciplinary cases; nor am I persuaded that three months' suspension is "otherwise unwarranted." Accordingly, I dissent from the court's rejection of the Board's recommended disposition.

---

**19.** Recently, we also imposed a year and a day suspension in the civil context where the respondent—in four cases—had been found responsible for one or more of the following: intentionally failing to carry out commitments to the client, DR 7–101(A), neglecting legal matters, DR 1–102(A)(4), and misrepresenting to the client that work had been done which had not been done. Respondent also had been informally admonished or publicly reprimanded in three prior neglect cases. *In re Roundtree,* 467 A.2d 143 (D.C.1983).