**In the Matter of Lawrence ROBERTSON, Respondent.**

No. 91–SP–730.

District of Columbia Court of Appeals.

Argued Feb. 25, 1992.
Decided July 7, 1992.

Marion E. Baurley, Washington, D.C., for respondent.

Elizabeth A. Herman, Asst. Bar Counsel, Washington, D.C., for petitioner.

Before FERREN and SCHWELB, Associate Judges, and MACK, Senior Judge.

FERREN, Associate Judge:

This matter is before the court on the recommendation of the Board on Professional Responsibility that we suspend respondent from the practice of law in the District of Columbia for 90 days and order him to pay a former client $7,191.61 in restitution. Although neither respondent nor Bar Counsel opposed the Board's recommendation, the case was assigned to the regular calendar for oral argument. Neither party filed a brief in this court. Upon reading the Board's Report and Recommendation, however, we asked the parties to focus their argument on the issue of restitution. We now conclude that the Board's recommendation that we order respondent to pay $7,191.61 to a former client is premised on an erroneous interpretation of "restitution" under D.C. Bar Rule XI, § 3(b). We therefore do not adopt the recommendation, for it would require us to impose an impermissible sanction under our rules.

We agree, however, with the Board's uncontested findings that respondent violated Disciplinary Rules 6–101(A)(3) (neglect of a legal matter), 7–101(A)(1) (intentionally failing to seek the lawful objectives of a client), 7–101(A)(2) (intentionally failing to carry out a contract of employment for professional services), and 7–101(A)(3) (intentionally prejudicing or damaging a client during the course of the professional relationship)—as explained in relevant portions of the Board's report attached as an appendix to this opinion. Because the Board's recommendation of a 90–day suspension was coupled with a proposal that we order restitution, we cannot know what sanction the Board would have recommended if it had known its proposed restitution fell outside the limitations of Rule XI, § 3(b). Rather than remand for reconsideration of a proposed sanction, however, we believe it appropriate for this division of the court to impose the sanction, since imposition of sanctions is our responsibility in the first instance and we are in a position, on this record, to do so. Accordingly, in light of the Board's findings and the circumstances of this case, we order respondent's suspension from the practice of law for 120 days.

I.

According to the Board's report:

Respondent was retained by Mr. Russell Miller in March or April of 1984 to prepare and file Maryland and federal income tax returns for Mr. Miller for 1983. Mr. Miller was acquainted with Respondent through seminars they had attended together and through previous legal work undertaken by Respondent on behalf of Mr. Miller.

Mr. Miller provided Respondent with all of his relevant tax records and documents and did not keep copies. When Respondent did not complete work on Mr. Miller's 1983 returns in time to meet the April 1984 filing deadline, an extension was requested by Respondent and Mr. Miller. The extension expired without Mr. Miller's tax returns having been filed and without Respondent having communicated with Mr. Miller as to the status of the returns. Thereafter, Mr. Miller continued to file for extensions, not only for 1983, but also for 1984, 1985, 1986, 1987 and 1988. Mr. Miller believed he could not file complete and accurate tax returns for years subsequent to 1983 until his returns for that year were completed and his records returned to him.

From the fall of 1984 until Mr. Miller complained to Bar Counsel in 1989, Mr. Miller repeatedly communicated to Respondent his desire to have his 1983 tax returns completed. He forwarded all communications from the IRS concerning his tax returns to Respondent and was repeatedly assured by Respondent that the forms would be completed shortly. In 1987 Mr. Miller hired another attorney, Charles M. Shryock, III, to assist him in his efforts to have Respondent complete the tax forms for 1983 or return Mr. Miller's records. The tax forms were never prepared or filed by Respondent. Mr. Miller's tax returns for the years 1983–1985 were prepared and filed for him in December 1989 by an accountant engaged by Mr. Shryock, approximately one month after Respondent furnished Mr. Miller's records to Mr. Shryock.

In the five years Respondent retained Mr. Miller's records, Respondent never told Mr. Miller or Mr. Shryock that he required additional information in order to permit him to complete and file the 1983 returns. Instead, Respondent repeatedly told Mr. Miller and later Mr. Shryock that the work would be completed in a matter of weeks or days. When Respondent finally turned Mr. Miller's records over to Mr. Shryock, the accountant engaged by Mr. Shryock requested only one additional item of information, which Mr. Miller promptly provided.

Both Maryland and the IRS denied Mr. Miller's claims for refunds for 1983, 1984 and 1985 on the ground that they were filed more than three years after the returns were due to be filed. Mr. Shryock testified that the total amount of the denied claims was between $16,000 and $25,000. The record does not contain further support for that estimate. Bar Counsel's exhibits show that Mr. Miller claimed refunds and overpayment credits of $5,376.73 and $1,814.88 on his 1983 Maryland and federal returns, respectively, and that those claims were denied as untimely. [Citations to record omitted.]

The Hearing Committee recommended that the Board reprimand respondent and order him to make restitution. Respondent repeatedly had stated his intention to compensate Mr. Miller for losses respondent had caused. Respondent did not oppose a restitution sanction, nor did he suggest a specific sum for the restitution order.

## II.

■ The Hearing Committee recommended a reprimand rather than a more severe sanction because of respondent's promise to "make reparations for any financial damage Mr. Miller might sustain by way of lost [tax] refunds." Because there was some ambiguity concerning the exact amount of Mr. Miller's loss, the Hearing Committee recommended that respondent submit a specific, written "restitution plan." Respondent apparently promised, but failed, to do so. The Board, therefore, properly considered respondent's failure to carry-out his promise when it recommended a sanction. See In re Solomon, 599 A.2d 799, 800–01 (D.C.1991). After reviewing previous decisions of this court imposing sanctions for similar violations, and after taking into account the fact that respondent had not been subject to prior discipline and that his misconduct related to a single client, the Board recommended a 90–day suspension. The Board also recommended "restitution" to enforce respondent's promise to pay Mr. Miller for his financial loss.

We agree with the Board that sanctions in similar cases have ranged from suspensions of 60 days to six months. See, e.g., In re Lawrence, 526 A.2d 931, 933 (D.C. 1986) (intentional failure to seek client's lawful objectives and intentional failure to carry out employment contract warrant 60–day suspension; listing similar cases in which court ordered suspensions of 90–days or six months). We also agree that there are certain aggravating circumstances we should consider in this case: the duration of respondent's misconduct, the economic damage the Hearing Committee found he knowingly caused his client, and respondent's failure to follow through on his promise to reimburse his client for fi-

nancial losses attributable to respondent's ethical defaults. Because, however, we cannot adopt the other element of the Board's recommended sanction, restitution, for reasons stated in Part III below, we conclude that the most appropriate sanction, in light of previous cases, would be a 120–day suspension. *See, e.g., In re Jamison,* 462 A.2d 440, 442 (D.C.1983) (failure to carry out contracts of employment and neglect of legal matter warrant three-month suspension); *In re Knox,* 441 A.2d 265, 268 (D.C.1982) (neglect of legal matter warrants three-month suspension); *In re Russell,* 424 A.2d 1087, 1088 (D.C.1980) (serious neglect of client's case coupled with failure to cooperate with Bar Counsel warrants six-month suspension).

### III.

D.C.Bar R. XI, § 3(b) empowers this court or the Board on Professional Responsibility to "require an attorney to make restitution either to persons financially injured by the attorney's conduct or to the Clients' Security Trust Fund (see Rule XII), or both, as a condition of probation or of reinstatement." In this case, in addition to recommending a suspension, the Board recommends requiring respondent to make "restitution" to Mr. Miller in the amount of $7,191.61, the total amount of the refunds and overpayment credits Mr. Miller claimed on his 1983 Maryland and federal income tax returns. Presumably, Mr. Miller would have received this amount from the state and federal governments but for the running of applicable limitation periods attributable to respondent's neglect of his professional obligations.

In recommending this amount of restitution, the Board appears to adopt a definition of "restitution" that both the Hearing Committee and Bar Counsel have proposed: restitution should aim at making the client whole. Because we find no support for this expanded concept of restitution in this court's previous disciplinary decisions, and because the Board's definition blurs the distinction between restitution and consequential damages, which are more appropriately determined in a civil adjudication,

we cannot adopt the Board's recommendation.

In defining restitution the way it did, the Board relied primarily on dicta in a concurring opinion that no division of this court has adopted. In *In re O'Donnell,* 517 A.2d 1069 (D.C.1986), the court adopted the Board's recommendation that we suspend the respondent for a year and require him to make restitution of the $1,000 fee his clients had paid him to form a corporation and to file an application for a liquor license. Judge TERRY, in his concurring opinion, stated:

> Were it not for the existence of [a $400,-000 civil judgment in favor of the respondent's clients against the respondent], I would vote to require far greater restitution to [the clients] than a mere $1,000, which represents only a refund of the retainer they paid to respondent and does not even begin to make them whole.

*Id.* at 1069. Seen in context, we believe Judge TERRY was expressing understandable dissatisfaction with the respondent's failure to satisfy an earlier civil judgment for damages his former clients had won against him for his professional negligence. Judge TERRY went on to remark that before reinstating the respondent, the court should consider whether the respondent had satisfied the civil judgment. *See id.* at 1070.

This court has never precisely defined, in a published opinion, the meaning or scope of "restitution" under Rule XI, § 3(b). However, in an unpublished decision, *In re Anderson,* No. 86–657 (D.C. July 28, 1986), this court adopted a Board report and recommendation that specifically addressed the meaning of restitution under our disciplinary rules. In *Anderson,* Bar Counsel requested that the respondent be ordered to pay $29,627.59, representing the client's damages. The Hearing Committee disagreed, recommending that the Board order restitution of $2,000, the amount of the fee the client had paid to the respondent. The Board agreed with the Hearing Committee. In its report to this court in *Anderson,* the Board noted that the "Rules of the Court of Appeals clearly contemplate that the

Court can determine and order restitution to an aggrieved client of an amount that he or she has paid to culpable counsel." Then, after citing and quoting from *Lee v. Foote*, 481 A.2d 484, 485–86 (D.C.1984) ("The purpose of restitution is to require the wrongdoer to restore what he has received...."), and other contract cases, the Board declared: "the object of restitution is simply to restore to an injured person what another has wrongfully obtained from him."

We agree with the Board's analysis of disciplinary restitution in *Anderson*. We have adopted, at least implicitly, this much narrower, more traditional meaning of restitution than the broad interpretation both Bar Counsel and the Board suggest based on Judge TERRY's concurring words in *O'Donnell*. Our previous orders demonstrate that this court and the Board have adhered to the following definition of restitution: a payment by the respondent attorney reimbursing a former client for the money, interest, or thing of value that the client has paid or entrusted to the lawyer in the course of the representation.[1]

For example, in *O'Donnell*, 517 A.2d at 1069, this court, on recommendation of the Board, limited the required restitution to the $1,000 retainer fee the clients had paid the attorney. Likewise, in *In re Roundtree*, 467 A.2d 143, 148 (D.C.1983), we adopted the Board's recommendation of $410 in restitution, representing what the client had paid to the lawyer, characterized as her "out of pocket" expense. *See id.* In *In re Landesberg*, 518 A.2d 96 (D.C.

1986), we ordered client restitution in the amount of $1,200. The Board arrived at that sum by adding the $900 fee the client had paid to the respondent to $300 the client had paid in interest as a result of borrowing money to pay the fee. *See id.* at 103 (Board report attached as appendix). The $1,200, therefore, represented the client's out of pocket expense, including what the client had to pay in order to give the respondent his fee. In *In re Solomon*, 599 A.2d 799 (D.C.1991), the respondent had failed to follow through on a promise he had made to Bar Counsel that he would reimburse the fee and expense money his client had paid him. We concluded that it was appropriate to enforce this particular promise and ordered restitution of these items. *Id.* at 800–01. *See also In re Santana*, 583 A.2d 1011, 1012 (D.C.1990) (ordering respondent to pay restitution to former client in amount client had paid respondent); *In re Taylor*, 511 A.2d 386, 386 (D.C.1986) (same); *In re Washington*, 541 A.2d 1276, 1277 (D.C.1988) (ordering restitution of fee and or expense money advanced by each of respondent's wronged clients).[2]

The definition of disciplinary restitution we explicitly adopt today comports with the common law definition under the RESTATEMENT OF CONTRACTS (SECOND) § 370 (1981): a restitution interest is an interest "in *having restored* to [one party] any benefit that [he or she] *has conferred* on [another] party." *Id.* at comment a (emphasis added).

---

1. Rule XI, § 3(b) also allows the Board or this court to order a respondent to pay restitution to the Clients' Security Trust Fund as an alternative, or in addition, to restitution to a former client.

2. We are sometimes called upon to review the trial court's order of criminal "restitution or reparation" under D.C.Code § 16–711 (1989). *See Sloan v. United States*, 527 A.2d 1277, 1288–90 (D.C.1986) (per curiam); *Jones v. United States*, 560 A.2d 513 (1989); *Hardy v. United States*, 578 A.2d 178 (1990). Section 16–711 provides sentencing options and its purpose is punishment. *See Sloan*, 527 A.2d at 1289. In general, the term "reparation" means a criminal penalty paid to victims of the criminal act based on damages and losses suffered by the victims. *See* BLACK'S LAW DICTIONARY 1167 (5th ed. 1979). D.C.Code § 16–711 neither defines nor distinguishes between "restitution" and "reparation." It does, however, order the trial court to take into consideration various factors including "the actual damage to each victim." *Id.*, § 16–711(b). Because of the differences between the criminal law and bar disciplinary rules, we do not find § 16–711's inclusion of damages within the scope of "restitution or reparation" to be of use in our analysis. We do note, however, that just as the criminal restitution statute "was not designed to serve as an additional civil remedy for victims of crime, but as a tool for use in sentencing," *Sloan*, 527 A.2d at 1289, the disciplinary rule permitting restitution is designed not to authorize complete civil relief but to assure that an attorney who violates the disciplinary rules is not unjustly enriched by retaining funds supplied by the client.

As the Introductory Note to restitution in the RESTATEMENT recognizes, the objective of restitution is

not the protection of a party's expectation or reliance interests but the prevention of unjust enrichment.... A party who has received a benefit at the expense of [another] ... is required to account for it, either by returning it in kind or by paying a sum of money.

*Id.* at p. 199. Restitution is thus distinct from reliance or expectation damages under contract doctrine or from reasonably foreseeable damages under tort doctrine. In such civil actions, the goal is to compensate an injured party for damages caused by another's breach of contract or duty, *i.e.,* to make that party whole.

■ As we have stated before, a disciplinary proceeding is an inappropriate forum for determining issues relevant to a client's damages resulting from attorney malpractice. *See In re Haupt,* 444 A.2d 317, 317 (D.C.1982); *In re Anderson, supra* (Board report attached as appendix) ("Bar disciplinary system is not well suited to assessing damages for tortious conduct or breach of contract"). The disciplinary process is not designed to handle questions of causation, foreseeability, burdens of proof, mitigation, contributory negligence, and other issues which have to be resolved in a civil suit for damages and inevitably would come into play if we were to expand the definition of restitution, for disciplinary purposes, beyond its traditional scope and meaning.[3] We could, of course, expand, for disciplinary purposes, the traditional meaning of "restitution" to include easily ascertainable damages, on the ground that proof problems would be minimal. But

such an approach would be an arbitrary loosening of the plain meaning of the term—a result not clearly intended by the drafters of the rule—and would likely result in quibbles preventing an easily administrable sanction.

In summary, we conclude that the Board's recommendation that respondent pay $7,191.61 to Mr. Miller was premised on an erroneous interpretation of "restitution" under Rule XI, Sec. 3(b). Therefore, because the Board's proposed recommendation would be inconsistent with our previous disciplinary orders and would be impermissible given our interpretation of "restitution" under Rule XI, Sec. 3(b), we decline to adopt the Board's recommended sanction. *See* D.C.Bar R. XI, § 9(g).[4]

## IV.

Our dissenting colleague would adopt the Board's recommendation that we order $7,191.61 in "restitution," not because that recommendation conforms to the requirements of D.C.Bar R. XI, § 3(b), but because respondent "initially proposed and later effectively agreed to the relief recommended by the Board." *Post* at 15. He chides the majority for interpreting and applying Rule XI, § 3(b) without briefing from the parties.

■ Contrary to the dissent's characterization of this matter, we did not raise the issue of restitution on our "own initiative." That issue was before us as a matter of law because only this court, not the Board, may order suspension with restitution as a condition of reinstatement. *See* D.C.Bar R. XI, § 3. In cases involving suspension, *id.*

---

**3.** The difficulty of assessing damages in a disciplinary proceeding is exemplified by the Board's action in this case in foregoing Bar Counsel's proposed restitution of between $16,000 and $25,000, representing the cumulative amount of anticipated refunds the client supposedly lost from not filing tax returns in 1983, '84 and '85. Because the Board could not ascertain the amount of the client's losses caused by respondent's neglect regarding the 1984 and 1985 income tax returns, the Board limited its recommendation for restitution to the $7,191.61 the client almost assuredly would have received in refunds if he had filed his 1983 tax returns on time. The Board's difficulty in drawing the line

between clear and less clear losses shows why any measure of restitution that would extend to consequential damages would cause proof problems better handled in traditional judicial forums with the right to a jury in appropriate cases.

**4.** There is no evidence in the record that respondent received (or failed to return) any fee or expense funds from Mr. Miller. We also note that the Board did not recommend conditioning respondent's reinstatement on anything other than restitution.

at § 3(a)(2), in contrast with a reprimand, *id.* at § 3(a)(4), the Board only makes a recommendation to this court. Although we defer to the Board's findings of fact and give great weight to the Board's recommendation in cases such as this, this court must interpret and apply our disciplinary rules and order discipline in the first instance. This is not a case of appellate review of a final agency order based on an agency's interpretation of its governing statute. Furthermore, we cannot adopt a recommendation that we order "restitution" if it goes beyond the scope of what our rules allow simply because the respondent attorney has not effectively contested the recommendation.

 We have no rule or policy that allows the court to impose negotiated discipline without regard to the meaning of our disciplinary rules. Only our rule on disbarment by consent, D.C.Bar R. XI, § 12, allows a negotiated sanction, and under that provision the meaning and requirements of the rule are clear. Moreover, Rule XI, § 12 requires that issue be joined; the rule requires an affidavit from the attorney acknowledging that the material facts alleged as misconduct are true. This requirement assures not only that a respondent's admission is on record but also that the sanction fits the facts—that the sanction is not too great for the attorney's misconduct. In short, we do not impose discipline without regard to what the rule relied on means and whether it applies to the facts presented.[5]

 The cases on which the dissent relies, far from applying *"a fortiori"* to this case, are inapposite. Those cases say that a respondent attorney who claims lack of notice of the charges or other procedural irregularities, without having raised them before the Hearing Committee or the Board, will be held to have waived such claims, consistent with due process. *See In re Alexander,* 496 A.2d 244, 254 (1985) (per curiam); *In re Rosen,* 470 A.2d 292,

299 (D.C.1983); *In re James,* 452 A.2d 163, 168–69 (D.C.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983) (per curiam). There is not a hint in any of these cases that we may impose a sanction against a defaulting attorney without being sure that the sanction is permitted under the rules. We obviously have to be sure we have authority to impose a particular sanction before we do so; otherwise, we might be party to a lawless exercise. Ultimately this court, not the Board, decides the meaning of the rules this court has adopted. We therefore cannot simply rubberstamp an order imposing attorney discipline if it is premised on an erroneous interpretation of our rules, even if the attorney has not contested the recommended sanction.

 The question whether we should have insisted on briefing is a closer one, and we agree that, ordinarily, we would not proceed without it. However, as the cases we cite make clear, this court has had a consistent understanding that "restitution" under D.C.Bar R. XI, § 3(b) has a traditional, limited meaning which this court acknowledged by adopting the Board's report in 1986 in *Anderson,* an unpublished opinion. Furthermore, in the present case the Board adopted and applied a definition of "restitution" advocated by Bar Counsel and the Hearing Committee. The Board's position is entirely clear, and its report cites many if not most of our cases in this area, forming the substance of a brief. Finally, oral argument was very helpful in focusing the issue and testing our concerns, and neither party asked for permission to file a post-argument brief on the issue we specifically directed them to address. All things considered, therefore, we conclude that the issue is straightforward, has a clear answer, and should be resolved without further delay.

In resolving the case as we do, we are concerned for the client—Mr. Miller certainly deserves better—although Mr. Miller

---

5. Respondent's failure to contest the Board's recommended restitution order is not the functional equivalent of a "consent decree." Dissent, *post* at 1247, 1248 n. 11. Respondent has

not negotiated a judgment with Bar Counsel and the Board based on a compromise intended to resolve and forestall further litigation.

must share some of the blame for his losses. He waited until 1987 to hire another attorney to prepare his 1983–1985 tax returns, which were not filed until December 1989, the year when Mr. Miller also complained to Bar Counsel. In any event, we feel no sympathy for the respondent.[6] But we have to act lawfully. There may be an effective way to mix lawyer discipline with provision of more complete relief to the client than restitution, but presently a damages remedy is not available under our rules.

Accordingly, it is

ORDERED, that Lawrence Robertson be suspended from the practice of law in the District of Columbia for 120 days, effective thirty days from the date of this opinion and order.

SCHWELB, Associate Judge, dissenting:

My colleagues in the majority treat this case as one which raises an abstract question regarding the meaning of "restitution" under D.C.App. Rule XI, § 3(b), rather than as a concrete dispute with a litigation history of its own and with consequences for flesh and blood people. In doing so, they largely let off the financial hook a lawyer who neglected his client's case for several years, who intentionally failed to carry out his contract of employment to the severe detriment of his client's interest, who thereafter repeatedly promised to make the client whole in order to obtain lenient treatment, and who then broke all of his promises,[1] thus leaving his unfortunate victim high and dry and paying him nothing. Remarkably, the majority grants the errant lawyer a victory which he never asked for, on the basis of a legal theory for which he has never contended, without the issue ever having been briefed by the parties to this court, to the Board on Professional Responsibility, or to the Hearing Committee.

Irrespective of the merit, or lack thereof,[2] of the majority's interpretation of restitution as applied to some hypothetical case in which the point was contested, it is unreasonable and unjust to apply the doctrine adopted by my colleagues to a situation like the present one. Here, the lawyer, Lawrence Robertson, Esq. initially proposed and later effectively agreed to the relief recommended by the Board. Indeed, he has attempted to use to his own advantage his purported willingness to make whole the man whose trust he betrayed.[3] I can agree neither with the majority's adherence to an abstract view of this case nor to its disposition of a complex issue without refinement through the conventional adversarial process.

Instead of rejecting the Board's recommendation and imposing an extra month's suspension but relieving Robertson of his obligation to compensate his former client, I would adopt the remedy suggested by the

---

**6.** We believe that the dissent's "non-opinion" that Mr. Miller will be unable to bring a civil suit is speculative. Furthermore, if respondent indeed did attempt to extract disciplinary leniency through his promise to compensate Mr. Miller, as the dissent asserts, then it backfired: respondent's failure to make good on his promise was a factor in both the Board's recommendation of a 90 day suspension and our order imposing a 120 day suspension.

**1.** In the words of the once-feared revolutionary leader whose statues in lands stretching from the Danube to eastern Siberia have recently been toppling like ninepins, "[p]romises are like pie crusts, made to be broken."

**2.** *Compare* the unpublished decision in *In re Anderson*, No. 86–657 (D.C. July 28, 1986) with *In re Landesberg*, 518 A.2d 96 (D.C.1986) and *In re O'Donnell*, 517 A.2d 1069 (D.C.1986) (Terry, J., concurring).

**3.** The client, Russell G. Miller, testified in pertinent part:

I was feeling betrayed because I had asked—I had been promised so many times that it would be done. I kept wondering how anybody could be so heartless to keep a person dangling for so many years. It was the height of anxiety, and then I would get promises and I would feel great, and then nothing would happen. I was going up hills and valleys. It was pretty bad.

One reason for Mr. Miller's anxiety was his concern that criminal charges would be filed against him for failure to file his income tax return.

None of this was the client's fault. Robertson testified that "Mr. Miller is an ideal client for any young, struggling attorney. He pays on time." He added that "I really can't make up to him for the stress he went through."

Board. I would make it clear that we do so because Robertson has effectively consented to it, and that the award of restitution was not the result of contested litigation and is without precedential value for any case in which another lawyer may raise the issue which Robertson did not contest. Since the majority decides otherwise, however, I respectfully dissent.

### I

The melancholy tale of Robertson's representation of Russell G. Miller, a microbiologist who had entrusted his 1983 income tax returns to Robertson, is set forth in the portions of the Board's report which are reproduced in the majority opinion. After years of neglect and procrastination by Robertson, a complaint was duly made to Bar Counsel. What happened next bears recounting with precision.

In his response through counsel to Bar Counsel's petition, filed in June 1990, six years after Mr. Miller asked Robertson to prepare his 1983 returns, Robertson himself broached the subject of restitution. He stated that he had turned over Mr. Miller's records to successor counsel the previous December

> with the understanding that Respondent would voluntarily make reparations for *any financial damage Mr. Miller might sustain* by way of lost refunds and penalties as a result of Respondent's delay in completing the necessary work. *Respondent stands by that promise.*

(Emphasis added.) Robertson concluded his pleading by stating that if his conduct violated any ethical proscription, the disciplinary authorities should consider several allegedly extenuating factors, including his "sincere remorse" and his "voluntary offer of restitution."

The case was assigned to Hearing Committee No. 4. Robertson testified before the Committee that he had made it clear to Mr. Miller that he (Robertson) had "messed up." To the extent that Mr. Miller had been prejudiced, Robertson "intended to

make him whole." Robertson added that, as to the amount of restitution, "at this point, I am not inclined to be overly concerned with this dollar, or even this thousand dollars."

In his post-hearing brief, Robertson again urged the Hearing Committee to be lenient. He asked it "to recommend informal admonition/private censure, with or without a requirement of restitution." He then reiterated his noble intentions:

> No purpose would be served by imposing a more severe sanction on Mr. Robertson. He is well aware of the consequences of his conduct. He initiated restitution measures and will undoubtably [sic] have a written restitution agreement before this committee renders its report. For these reasons, Mr. Robertson takes no position on whether the committee should recommend restitution as a condition of or as part of the sanction imposed. Mr. Robertson will make restitution regardless of what the committee ultimately recommends.

The Hearing Committee issued its Report on August 20, 1990, approximately eight months after Robertson said he had turned over the records and promised to make full restitution. The Committee recommended a reprimand (but no suspension) together with restitution. The Committee concluded its Report as follows:

> In this case, one of the reasons the committee recommends a reprimand rather than a more severe sanction is because respondent has volunteered to make restitution. However, since there is some ambiguity concerning the exact amount of Mr. Miller's loss and about respondent's timeliness in actually performing the act of providing restitution,[4] the committee recommends that respondent be directed to submit *a specific, written restitution plan for complainant's actual loss* within 30 days of a final order in this matter.

(Emphasis added.)

Robertson filed no exceptions to the Hearing Committee's Report. *See*

---

4. Contrary to the assurance in his brief, Robertson had produced no written restitution agreement for the Hearing Committee.

D.C.App. Rule XI, § 9(b). Indeed, no further briefs were filed before the Board. Having reiterated in his initial pleading his alleged earlier promise to compensate Mr. Miller fully for any financial damage he may have suffered, Robertson interposed no objection to the Hearing Committee's recommendation, which contemplated restitution "for complainant's actual loss." This was the posture of the case when the Board considered the Hearing Committee's report.

The Board recognized, citing *Anderson, supra,* note 2, that "a disciplinary proceeding is not a forum well-suited to ascertaining consequential damages, and that is a reason to be cautious in ordering restitution to make the client 'whole.'" Noting Bar Counsel's contention that restitution should be in an amount between $16,000 and $25,000, the Board recommended that restitution be ordered only in the amount of $7,191.61—"the total amount of the refunds and overpayment credits claimed on Mr. Miller's 1983 Maryland and federal income tax returns, which were denied by Maryland and the IRS as time-barred."[5] The Board also recommended that this court suspend Robertson from practice for three months.

Robertson filed no exceptions to the report of the Board. *See* D.C.App. Rule XI, § 9(e). As a result, no briefs were filed in this court. Nevertheless, the case was set for argument, and the parties were directed to be ready to address the question whether the recommended award of $7,191.61 was properly characterized as "restitution" within D.C.App. Rule XI, § 3(b). At argument, Robertson's counsel indicated for the first time, with evident reluctance, that this question should be answered in the negative. But for the court's raising of the issue on its own initiative, no such contention would ever have been made on Robertson's behalf. We were also advised at argument that, notwithstanding all of his promises, Robertson had paid no restitution whatever.

5. The Board made it clear that the proposed award of restitution in that amount should be without prejudice to any attempt by Mr. Miller

II

Robertson, as we have seen, never raised before the Hearing Committee or the Board the question regarding the proper scope of restitution which the majority now decides in his favor. On the contrary, he offered from the outset to make his former client whole. He had no objection to the inclusion of a provision for restitution in the disciplinary order. Indeed, he specifically assured the Hearing Committee that he would not quibble over the amount he would be required to pay. Under these circumstances, even if Robertson had asked this court—which he did not—for the relief which has now been awarded to him, he would have encountered substantial difficulties with our precedents. As this court stated in *In re James,* 452 A.2d 163, 168–69 (D.C.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983) (per curiam),

> [W]e need not decide the merits of this issue, however, because respondent has not preserved his right to raise it in this court.

\* \* \* \* \* \*

Our consideration of Board findings and recommendations is similar to our review of administrative agency decisions.... In the context of administrative appeals, we do not address objections that could have been, but were not raised prior to judicial review.... The purposes of this policy are well known. First, when an issue is timely raised before the administrative tribunal, the problem may be corrected without the involvement of the appellate court, thereby avoiding a possible remand and subsequent appeal. Secondly, even when the complaining party does not get satisfaction from the administrative body, the appellate court's task is facilitated by the record of the agency's attention to the issue. Both of these considerations apply with comparable force in the context of disciplinary proceedings.

to secure additional compensation in civil proceedings.

(Citations and internal quotation marks omitted). *See also In re Alexander*, 496 A.2d 244, 245 (D.C.1985) (per curiam); *In re Rosen*, 470 A.2d 292, 299 (D.C.1983).

The decisions in *James, Alexander,* and *Rosen,* apply, *a fortiori,* to Robertson.[6] Each of the respondents in the cited cases finally raised the pertinent issue on his own initiative before this court, and asked us not to accept the recommendation of the Board. Robertson, by contrast, took no steps at all to bring the question before us. He therefor has even less basis than the other three respondents had for expecting this court to rule in his favor on the question which my colleagues have elected to address.

As we recently reiterated in *Hunter v. United States*, 606 A.2d 139 (D.C.1992), "[l]itigants should not be permitted to keep some of their objections in their hip pockets and to disclose them only to the appellate tribunal; one cannot take his chance on a favorable verdict, reserving a right to impeach it if it happens to go the other way." (Citations and internal quotation marks omitted.) Hunter failed to object to an improper prosecutorial argument, and this omission operated significantly to his disadvantage; we reviewed only for plain error, and found none. Here, by contrast, Robertson, who never raised the issue of restitution at all, is receiving the same consideration as he would have been given if he had contested it throughout. In fact, Robertson has received *more* rather than less favorable treatment as a result of his failure to challenge the proposed award, for we are deciding the case without the brief from Bar Counsel which would be before us if Robertson had objected before the Hearing Committee, the Board, or this court.

The foregoing discussion, of course, does not mean—indeed, it cannot mean—that anything goes if no party has objected. To take an example from the works of the immortal Bard, we would surely refuse to order that the client be awarded a pound of the lawyer's flesh, even if a "bond" so provided, if no one objected, and if the Board were of the opinion that we should enforce the bond. Consent will not validate the unconscionable.

There may be other remedies, less unconventional and extreme than that contemplated in Shylock's bond, which should likewise be denied judicial approval, even if all parties have consented. Although the analogy is an imperfect one, I think that our responsibility with respect to the issue of restitution for Mr. Miller corresponds roughly to that of a trial court which has been asked to approve a proposed consent decree. The Board's recommendation here was substantially based on Robertson's agreement, and the Board never had the occasion to resolve a disputed point of law. This makes a great deal of difference, for a court to which a consent decree has been tendered does not inquire into the precise legal rights of the parties, but only assures itself that there has been a valid consent and that the terms of the decree are not unlawful, unreasonable or inequitable. *United States v. City of Jackson*, 519 F.2d 1147, 1151 (5th Cir.1975). By the same token, a court is "not necessarily barred from entering a consent decree merely because it awards broader relief than the court could have entered after trial." *Local Number 93, International Ass'n of Firefighters, AFL–CIO v. City of Cleveland*, 478 U.S. 501, 525, 106 S.Ct. 3063, 3076, 92 L.Ed.2d 405 (1986).

In the present case, Robertson was represented by counsel. His consent, reflected in the offers which he made on his own initiative and in his repeated failure to

---

**6.** In *Rosen,* for example, the respondent was found to have neglected a legal matter entrusted to him. He claimed in this court that the disciplinary rule proscribing neglect is unconstitutionally vague. We held, however, that he had waived the point by failing to present it to the Hearing Committee and to the Board.

The alleged defect in *Rosen* was far more fundamental than the one which the majority finds here. Despite the fact that the respondent in *Rosen*, unlike respondent Robertson, had at least argued his point after the case reached this court, we declined to consider it. Obviously, in *Rosen*, this court would not have been disposed on its own initiative to reach the merits of a claim which had not been asserted before any tribunal at all.

object, was surely valid; indeed, the suggestion for restitution initially came from him. Moreover, the award of a sum designed to make the client whole, whether or not it would have been made if the issue had been contested, is not unlawful, unreasonable or inequitable. There is nothing wrong with fully compensating a victim of one's neglect without forcing him to go to court. Indeed, the recommendation for "make whole" restitution received the unanimous support of the members of the Board and the Hearing Committee, as well as of Bar Counsel.[7]

The majority's disapproval of restitution in an amount to which Robertson never objected may, on the other hand, be extremely unfair to the client. In light of Robertson's posture before the Hearing Committee and the Board, Mr. Miller may well have thought it unnecessary to retain an attorney to bring a civil action for legal malpractice. Although I express no opinion on the complex limitations issues which can arise under such circumstances, it may now be too late for Mr. Miller to sue. *See, e.g., Bond v. Serano,* 566 A.2d 47 (D.C. 1989) (per curiam) (rejecting doctrine of equitable tolling where plaintiff sued in what turned out to be the wrong forum); *Curtis v. Aluminum Ass'n,* 607 A.2d 509, at 509–510 (D.C.1992) (per curiam) (same).[8]

Accordingly, this court should adopt the recommendation of the Board. Even assuming that my colleagues are right about the meaning of "restitution," this is not the case to make their point. We could avoid without difficulty the creation of an allegedly erroneous precedent by making it clear in our opinion that the award of restitution in the amount specified is based on Robertson's failure to object, and that it has no precedential value beyond that of a consent decree. As the court pointed out

in *City of Jackson, supra,* 519 F.2d at 1152,

> courts fully understand that such decrees do not purport to be definitive statements of the parties' legal rights and will accord them little or no weight in the determination of the rights of persons not party to them.

— — —

I add a few words in response to Part IV of the majority opinion. The standard which the courts apply in determining whether to approve a disposition to which the parties have consented is, as I have noted, far less exacting than that which is utilized in reviewing contested orders. *See United States v. Allegheny–Ludlum Industries, Inc.,* 517 F.2d 826, 850 (5th Cir. 1975), ("our scope of review is narrow"), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). A court may well approve relief in a consent decree which it would not award if the point were disputed. Chiding me for "suggesting that we order restitution without regard to what our rules allow," my colleagues completely overlook this critical distinction. For reasons that seem to me to exalt perceived pristine analytical purity over the practical requirements of the law and of justice, they deny a wronged client relief which even the offending lawyer claims to be willing to provide him.

The parties having consented to the principle of "make whole" restitution, the court's responsibility is not to treat the case as if such relief were being challenged. It is not our function to overlook the acquiescence of the parties and to probe the theoretical merits of an issue which is not being contested before us and

---

7. As a matter of fact, Bar Counsel recommended restitution in a substantially greater amount.

8. *See Brown v. Jonz,* 572 A.2d 455, 457 n. 6 (D.C.1990); *cf. Westinghouse Electric Corp. v. City of Burlington, Vermont,* 122 U.S.App.D.C. 65, 67, 351 F.2d 762, 764 (1965). Contrary to the suggestion in footnote 5 to the majority opinion, it is not at all "speculative" that under the analysis adopted by my colleagues, a client

who relies on the lawyer's promises to the Hearing Committee, the Board, and the court that he will make the client whole, and who therefore fails to institute an action for malpractice, will find himself out in the cold if the statute of limitations runs. The clear import of the majority opinion is that Mr. Miller loses whether or not such an action against Robertson would be time-barred.

which has not even been briefed.[9] Rather, we must decide whether the proposed remedy is unlawful, unreasonable or inequitable. *City of Jackson, supra.* That, in my view, is the question here presented. If my colleagues had asked it, they would surely have been compelled to agree that the right answer—the only reasonable and just answer—is a resounding no![10]

### III

The decision which the majority reaches today has considerable significance for lawyers and clients in this jurisdiction. If, as my colleagues say, the restitution which the client can obtain from the lawyer through the disciplinary process consists of no more than any "money, interest or thing of value that the client has paid or entrusted to the lawyer in the course of the representation," without any further compensation for losses incurred, then a client who has been injured by an attorney's unethical conduct and who has participated in any disciplinary proceedings will also have to hire another lawyer and sue the wayward advocate.

In the words of Judge Learned Hand, a disciplinary proceeding is one "designed in the public interest to preserve the good name and the uprightness of the bar, made up, as it is, of attorneys who are public officers." *Doe v. Rosenberry,* 255 F.2d 118, 120 (2d Cir.1958). A client who participates in such a proceeding against an attorney who has violated his ethical obligations thus provides a service to the bar and to the public at large. The client's practical interest should therefore be an important consideration in determining how the process is to work. If the client who has testified in a disciplinary proceeding nevertheless has to retain a new attorney to sue the former one in order to secure any meaningful relief, he is likely to regret having gone to Bar Counsel in the first place, and the incentive for victims of unethical conduct to participate in the disciplinary process will be significantly chilled. The outcome in this case also promotes the public image of judges and lawyers as anxious to protect their own interest at the expense of the interest of the public at large.

Traditionally, the disciplinary process was not at all concerned with granting monetary redress to clients for wrongs allegedly done to them. *See, e.g. State Bar of Michigan v. Daggs,* 384 Mich. 729, 733, 187 N.W.2d 227, 228 (1971). The provision in our rules for an award of restitution has, however, modified this principle at least in some measure. The concept of restitution to clients is quintessentially remedial, and the provision authorizing such relief merits a generous construction. At the very least, it should not be given a crabbed reading without full consideration by the court of all of the arguments which counsel are in a position to make.

I am therefore disappointed that the majority delivers this quite unnecessary blow to the interests of clients[11] (and, indirectly,

9. The majority says that "[w]e have no rule or policy that allows the court to impose negotiated discipline without regard to the meaning of our disciplinary rules." If this means that conventional standards for the approval of consent decrees and similar dispositions are out of bounds, I know of no conceivable reason why this should be so, provided that the court jealously guards the public interest. In the present case, striking down restitution which Robertson effectively agreed to pay provides no conceivable benefit to the public interest.

10. Like "the flowers that bloom in the spring" in "The Mikado", D.C.App. R. XI, § 12 (our consent disbarment rule), on which my colleagues rely, "ha[s] nothing to do with the case." That Rule neither explicitly nor implicitly governs or purports to affect the scope of our review of Board proposals to which no party has objected.

According to the majority, the consent disbarment rule assures that the respondent's admission is on record and that the sanction is "not too great for the attorney's misconduct." Maj. op. at 1243. Here, we already have more than adequate assurance on both points. It is undisputed that Robertson did not contest the Board's recommendation. Moreover, the notion that the proposed award in this case, unopposed by Robertson, is excessive surely borders on the fanciful. If it were indeed "too great," surely the man who would be required to pay, and who has been represented by competent counsel throughout these proceedings, would have had something to say on the subject.

11. My colleagues say that "[i]n resolving the case as we do, we are concerned for the client; Mr. Miller certainly deserves better." I agree with the sentiment, especially the part after the

to the public image of the bench and bar) without even requesting briefs from the parties.[12] Do my colleagues really believe that counsel could provide no assistance to the court with respect to the difficult substantive and procedural issues here presented? We recently reiterated en banc that important legal questions ought not to be decided until they have been tested by the fires of adversary presentation. *Allen v. United States*, 603 A.2d 1219, 1228–29 (D.C.1991) (en banc) (citations omitted); *see also United States v. Fruehauf*, 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 476 (1961). The fires in this case have been like lukewarm tea, and I am afraid that the result reflects it.

I respectfully dissent.

## APPENDIX

District of Columbia Court of Appeals

Board on Professional Responsibility

In the Matter of:

LAWRENCE ROBERTSON,

Respondent.

Bar Docket No. 423–89

REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

\* \* \*

### VIOLATIONS

#### A. *DR 6–101(A)(3) (Neglect)*

DR 6–101(A)(3) provides that an attorney shall not neglect a legal matter entrusted to him. The Hearing Committee found that Bar Counsel had proved by clear and convincing evidence that Respondent consistently failed to carry out the obligations which he had assumed to his client. That finding is supported by substantial evidence in the record, and the Board adopts

it. In *In re Reback*, 487 A.2d 235 (D.C. 1985) (per curiam), *adopted in relevant part*, 513 A.2d 226 (D.C.1986) (en banc), the Court of Appeals quoted with approval a 1973 Informal Opinion of the ABA Committee on Ethics and Professional Responsibility, which described neglect as "indifference and a consistent failure to carry out the obligations which the lawyer has assumed to his client or a conscious disregard for the responsibility owed to the client." 487 A.2d at 238. The Opinion further stated that "[n]eglect usually involves more than a single act or omission. Neglect cannot be found if the acts or omissions complained of were inadvertent or the result of an error of judgment made in good faith." *Id.* The repeated communications between Mr. Miller and Respondent and later between Respondent and Mr. Shryock, his associate and staff, coupled with the length of time (five years) during which Respondent continually promised and failed to prepare and file Mr. Miller's 1983 tax returns, show unequivocally that Respondent's conduct went well beyond ordinary negligence or inadvertence and met the test for neglect as described in *Reback.* Thus, the Board concludes Respondent's failure to prepare and file Mr. Miller's 1983 income tax returns violated DR 6–101(A)(3).

#### B. *DR 7–101(A)(1) & (2) (Intentional Failure)*

These two rules provide that an attorney shall not intentionally (1) fail to seek the lawful objectives of his client or (2) fail to carry out a contract of employment. The Hearing Committee found that Respondent intentionally failed to seek the lawful objectives of his client, namely to prepare and file Mr. Miller's 1983 income tax returns. Report at 5. Likewise, the Hearing Committee found that Respondent failed to perform the legal services which were re-

semi-colon. With respect to the first part of the sentence, though, I can only respond that the majority's concern is welcome, but that a more enlightened and practical approach to a proposed disposition to which no party objects— one in conformity with principles applicable to consent decrees—would eliminate the chasm between word and deed.

12. Briefs are not required, according to the majority, because "neither party asked for permission to file a post-argument brief." This is hardly astonishing, since both parties were content with the Board's recommendation and filed no objection to it.

quired by the terms of his contract of employment, namely to prepare and file Mr. Miller's 1983 income tax returns. Report at 7.

The Court of Appeals in *In re O'Donnell,* 517 A.2d 1069 (D.C.1986), held that neglect ripens into intentional failure when a lawyer's inaction is coupled with an awareness of his obligations to his client. Although *O'Donnell* did not involve DR 7–101(A)(2), the Court's description of the elements of a violation of DR 7–101(A)(1) is equally applicable to DR 7–101(A)(2). *See also In re Lawrence,* 526 A.2d 931 (D.C. 1986). The record in this case is replete with examples of Respondent's continual failure to act in the face of numerous requests, telephone calls, demands and even warnings (in the form of correspondence addressed to Mr. Miller from the IRS). (Tr. 12–14, 46–50, 91–92.) Indeed, in 1988, Mr. Miller's successor counsel advised Respondent that Mr. Miller was "seriously running the risk of being subjected to criminal charges" as a result of Respondent's failure to file Mr. Miller's tax returns. (Bar Exhibit 4.) Nevertheless, Respondent failed for over an additional year thereafter to either do the work for which he had been retained or return Mr. Miller's records. Respondent's own testimony establishes that he was well aware of his obligations. Thus, we agree with the Hearing Committee's conclusion that Respondent's conduct went beyond neglect and constituted intentional failures within the meaning of DR 7–101(A)(1) and (2).

### C. *DR 7–101(A)(3) (Intentional Prejudice or Damage to Client)*

DR 7–101(A)(3) prohibits an attorney from intentionally prejudicing or damaging his client during the course of the professional relationship. There is no dispute that Maryland and the federal government denied Mr. Miller's refund claims for 1983, 1984 and 1985 on the ground that the claims were filed after the three-year statute of limitations had expired. Report at 4. Respondent had himself written the IRS stating that Mr. Miller was due refunds,

and Respondent admitted he was aware that there was a three-year statute of limitations applicable to such claims. (Tr. 91–92.)

Respondent suggested that at least until he became aware, on the eve of the hearing, of the denial of Mr. Miller's refund claims for 1983–85, he believed that the taxing authorities might permit Mr. Miller to apply the amount of time-barred refunds as credits against his tax liability in subsequent years. Respondent articulated no legal basis for that belief, which turned out to be incorrect. *See* Bar Exhibits 6, 7 and 9 (denying overpayment credits against 1984 estimated taxes for the amount of refunds claimed for 1983). Respondent's only explanation was his statement that "some things work." (Tr. 92.) After the three-year period had expired, Respondent suggested in a conversation with Mr. Shryock that the question should be "researched." (Tr. 102.) Thus, there is no doubt that Respondent by his conduct, at the very least, knowingly created a grave risk that Mr. Miller would lose his claims for refunds and overpayment credits and would be financially damaged, as the Committee found he was. Report at 7. Indeed, in our view the evidence is clear and convincing that Respondent understood that financial damage to Mr. Miller was substantially certain to follow from his conduct. That is sufficient to establish that Respondent intended to cause such damage, even though it may not have been Respondent's purpose or motive to cause damage or prejudice to Mr. Miller. *See* Prosser & Keeton, *The Law of Torts* § 8 (5th ed. 1984). The question is whether such proof of intent is sufficient to establish a violation of DR 7–101(A)(3).

In *In re Dory,* 528 A.2d 1247 (D.C.1987), the Court found that respondent violated DR 6–101(A)(3), DR 7–101(A)(1), and DR 7–101(A)(2). The Hearing Committee had also found a violation of DR 7–101(A)(3), but the Board had rejected that conclusion. The Court imposed a 30–day suspension. The majority did not discuss the Board's rejection of the Hearing Committee's conclusion as to DR 7–101(A)(3). Judge Belson filed a concurring opinion in which he

stated that he would uphold the finding of the Hearing Committee that the respondent had violated DR 7–101(A)(3), as well as DR 7–101(A)(1) and (2). Judge Belson expressed the view that under *In re Reback*, 487 A.2d 235 (D.C.1985) (per curiam), *adopted in relevant part*, 513 A.2d 226, 229 (D.C.1986) (en banc), "the test for an 'intentional' failure to seek a client's lawful objectives under DR 7–101(A)(1) [is] whether the attorney was 'demonstrably aware' of his or her neglect, or whether the neglect was so pervasive that [the attorney] must have been aware of it." 528 A.2d at 1248. Judge Belson added: "The same test should apply in determining, under the same disciplinary rule, whether an attorney intentionally prejudiced his or her client." *Id.* Applying that standard in *Dory*, Judge Belson concluded that the respondent "was 'demonstrably aware' that his failure timely to move for a new trial and to appeal prejudiced his client. By agreeing that Respondent violated DR 7–101(A)(1) and (A)(2), the majority has already accepted the conclusion that Respondent was consciously aware of his failure to act. Furthermore, it is undisputed that Respondent was aware of the early deadlines for filing a motion for a new trial and an appeal.... The meeting of those deadlines was crucial to the client's prospects of obtaining redress. Given his knowing and conscious failure to act in the face of foreclosure of his client's options, there can be little room for doubt that respondent was 'demonstrably aware' of the prejudice to his client." 528 A.2d at 1248–49.

We read Judge Belson's concurring opinion in *Dory* to support the proposition that it is sufficient to establish a violation of DR 7–101(A)(3) that the lawyer was "demonstrably aware" that prejudice or damage to the client would result from his conduct, and that such prejudice or damage did, in fact, result. As indicated above, we believe that the record here contains clear and convincing evidence that Respondent was substantially certain and hence demonstrably aware that Mr. Miller would suffer financial damage as a result of Respondent's failure to timely file Mr. Miller's

1983 income tax returns. Accordingly, we agree with the Hearing Committee that Respondent intentionally prejudiced and damaged Mr. Miller during the course of their professional relationship within the meaning of and in violation of DR 7–101(A)(3).

To summarize, the Board concludes, as did the Hearing Committee, that Respondent violated DR 6–101(A)(3) (neglect); DR 7–101(A)(1) (intentional failure to pursue a client's lawful objectives); DR 7–101(A)(2) (intentional failure to carry out a contract for professional services); and DR 7–101(A)(3) (intentional prejudice or damage to client).

\* \* \*

BOARD ON PROFESSIONAL RESPONSIBILITY
/s/ George W. Miller
By: George W. Miller
Chairman

Dated: June 21, 1991.

All members of the Board concur in the foregoing Report and Recommendation except Messrs. Carter and Cohen, who did not participate.