**In re S. Anita RYAN, Respondent,**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 94–BG–885.**

District of Columbia Court of Appeals.

Submitted Sept. 7, 1995.
Decided Jan. 29, 1996.

---

**5.** Section 22–3201(f) (Supp.1993).

Leonard H. Becker, Bar Counsel, and Elizabeth A. Herman, Senior Assistant Bar Counsel, were on the brief for petitioner, the Office of Bar Counsel.

Respondent filed a brief pro se.

Before TERRY, FARRELL, and KING, Associate Judges.

TERRY, Associate Judge:

The Board on Professional Responsibility ("the Board") has recommended that respondent be suspended from the practice of law for four months, pay restitution to certain clients, and show proof of her fitness to resume practice before being reinstated. This recommendation is based on a record establishing numerous disciplinary violations arising from her representation of five undocumented aliens. Respondent's main contention before this court is that the Board's credibility determinations and sanction recommendations were not supported by substantial evidence. We find no merit in this argument or in her subsidiary arguments, and thus we adopt the recommendation of the Board.

## I

Respondent is a sole practitioner of immigration law. At the time of the disciplinary violations in this case, she had a full-time teaching position in Boston and commuted to Washington on weekends to see her clients. During the rest of the week she relied heavily on a small support staff in her Washington office to handle legal matters; however, none of these employees had any legal or paralegal training.

Most of respondent's clients were indigent persons from other countries who spoke little or no English and, in the words of the Board's report, were "living and working on the periphery of the local economy." They sought her services in order to legalize their status in the United States through labor certifications. The labor certification process enables an alien to obtain permanent resident status through an application to federal labor and immigration agencies, supported by evidence that the applicant has an opportunity for a job which cannot readily be filled by qualified United States citizens. Two governmental bodies are involved in the process, the United States Department of Labor and a local agency called the Department of Economic and Employment Development (DEED). It is crucial for attorneys handling labor certification matters to meet several specified deadlines because DEED's authority to grant extensions is limited and, if DEED deactivates a case, the application must be resubmitted. Refiling an application causes the applicant to receive a new "priority date" at the bottom of the waiting list, which can be a serious disadvantage to an alien because of competing applications from other aliens who come from the same country and obtain earlier priority dates.

In June 1992 Bar Counsel filed a disciplinary petition against respondent, alleging several violations arising from her representation of five alien clients between 1989 and 1991. Four of the five cases involved misconduct by respondent related to labor certification proceedings, including missed filing deadlines [1] and failure to return client files when requested to do so. One of the labor certification clients, a native of El Salvador, also was involved in a deportation proceeding and sought respondent's assistance in presenting a claim for political asylum. A deportation hearing was scheduled for June 14, 1990, but neither respondent nor her client was present,[2] and as a result a deportation order was issued. When the client learned about the order the next day, he asked respondent to file an appeal and gave her $110 to cover the filing costs, but respondent never filed the appeal. In the fifth case the client, a native of Ghana married to an American citizen, hired respondent to assist him in obtaining permanent residency status in the

---

1. In three of these matters the applications were deactivated when respondent failed to meet deadlines (one application was deactivated four times in a period of two and a half years). In the fourth instance the application was successful, and the certification was issued; however, respondent never delivered it to the client because she claimed to have a lien on the document based on $800 in unpaid fees.

2. Respondent went on maternity leave in May 1990 without notifying her clients or leaving written instructions for her staff. She traveled from Washington to Philadelphia, where her child was born on June 4, 1990. On May 21 she moved for a continuance of the immigration hearing, which was then scheduled for June 14. The immigration court responded on June 1 with a request for more information, but respondent did not provide it. Except for her May 21 motion, respondent made no effort to obtain a continuance of the hearing or to arrange for other counsel to attend.

United States. He paid respondent a $200 installment toward her total fee of $1,000, and she helped him prepare some preliminary documents. Thereafter, however, she did nothing to assist him and did not accompany him to a scheduled interview with immigration authorities. After that interview was canceled, the client went to respondent's office and asked for the return of his files, but respondent refused to deliver them because she considered them her work product. Respondent also insisted on payment of the balance of her fee.[3]

After a series of evidentiary hearings, a hearing committee issued a report and recommendation which found the facts to be as we have summarized them in the preceding paragraph.[4] The committee concluded that respondent had committed multiple infractions with respect to four of the five clients[5] and recommended a four-month suspension from the practice of law, proof of fitness before resuming practice, and restitution in specified amounts to the four clients. In particular, the committee found that respondent had deliberately neglected client matters, habitually ignored agency deadlines in labor certification proceedings, and failed to return her clients' files to the clients after they had terminated her services. The committee also noted that despite a heavy caseload and the importance of meeting deadlines, respondent did not maintain any calendar system to record due dates. Finally, the committee took note of several aggravating factors: respondent's misrepresentations to the Office of Bar Counsel during its investigations, her defiant attitude toward the disciplinary system, her lack of understanding and appreciation of her ethical and professional obligations to her clients, and the fact that the clients of whom she took advantage were particularly vulnerable persons who spoke minimal English, were unaware of their legal rights, and were unfamiliar with the American legal system.

The hearing committee's report was forwarded to the Board, which issued its own report and recommendation after further briefing and oral argument. It accepted the committee's evidentiary findings and generally agreed with the recommended sanction. However, it also found further violations concerning the fifth client, and it reduced the amount of restitution to be paid.[6] The Board summarized respondent's disciplinary violations as follows:[7]

1. three separate instances of neglect under Disciplinary Rule (DR) 6–101(A)(3) of the former Code of Professional Responsibility and Rule 1.1 of the current Rules of Professional Conduct;[8]

2. two separate instances of intentional failure to pursue a client's lawful objectives, DR 7–101(A)(1) and Rule 1.3(b);

3. three separate instances of intentional failure to fulfill a contract of employment, DR 7–101(A)(2);

---

3. The client eventually obtained his residency status by filling out a second set of forms and going through the interview process without an attorney.

4. The facts are set forth in much greater detail in the hearing committee's thirty-page, single-spaced report.

5. With respect to the client whose labor certification was issued but never delivered by respondent, see note 1, *supra*, the hearing committee found no disciplinary violation because there was "considerable confusion and disagreement among [the witnesses] as to whose property the labor certification was."

6. The Board lowered the amount of restitution assessed by the hearing committee from $2,150 to $1,660, plus interest calculated at the six per-

cent legal rate in the District of Columbia. *See In re Dietz*, 633 A.2d 850 (D.C.1993); D.C.Code § 28–3302(a) (1991). The parties have advised us in their briefs that one of the clients eventually received reimbursement of $110 which respondent had previously refused to return to him. Bar Counsel accordingly offers no objection to a further reduction of the recommended restitution, from $1,660 to $1,550.

7. This is our paraphrase, not a direct quotation from the Board's report.

8. Through the end of 1990, attorney discipline in the District of Columbia was governed by our Code of Professional Responsibility. As of January 1, 1991, the Code was superseded by the new Rules of Professional Conduct. The conduct that is the subject of these proceedings occurred partially under the former Code and partially under the current Rules.

4. three separate instances of intentional prejudice or damage to a client, DR 7–101(A)(3) and Rule 1.3(b);

5. five instances of failure to return a client's files or other property, DR 9–103(B)(4) and Rule 1.16(d);

6. one instance of improper imposition of a lien on a client's property, Rule 1.8(i);

7. one failure to keep a client informed of a matter, Rule 1.4(a); and

8. one failure to withdraw from representation after being terminated, DR 2–110(B)(4).

The matter now comes before us on the Board's recommendation and respondent's exceptions.

## II

Respondent does not contest the recommended sanctions of the Board; instead she objects generally to the Board's findings, arguing that the Board "completely ignored the facts as they were outlined by the witnesses...."[9] Apart from the Board's credibility and evidentiary determinations, respondent also claims that labor certifications are the property of the employer and not the alien employee, and that she was therefore under no duty to return these documents to her clients. She also asserts that the Board and the hearing committee failed to analyze the alleged offenses properly—that they were not matters of neglect and misconduct, but simple issues of contract law. At least as to some of the complainants, respondent suggests that she had not yet established an attorney-client relationship, and thus no ethical violation could have occurred. Finally, respondent appears to argue that in some instances contracts were entered into, but that the evidence showed she was not at fault for various reasons when DEED deadlines were not met.

### A. *Disciplinary Violations*

■■■ The standard of review in disciplinary cases is well established. D.C.Bar Rule XI, § 9(g) requires this court to "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record...." *See, e.g., In re Gilchrist,* 488 A.2d 1354, 1357–1358 (D.C.1985); *In re Dwyer,* 399 A.2d 1, 11 (D.C.1979). We are fully satisfied that the Board's findings are supported by substantial evidence.[10] The record reflects that neither the Board nor the hearing committee ignored the lengthy testimony and extensive exhibits; instead, both prepared meticulous, detailed reports that reflect a careful weighing of the evidence presented.

■■■ Respondent's other arguments are equally unpersuasive. First, she argues that contract law governs this case, rather than rules of professional responsibility. She maintains that because her clients failed to fulfill their obligations under their retainer agreements, she was somehow relieved of her obligations to the clients. This assertion ignores the fundamental principle that an attorney's ethical duties to a client arise not from any contract but from the establishment of a fiduciary relationship between attorney and client. Such a relationship is often established before a contract even exists:

> The fiduciary relationship between an attorney and his client extends even to preliminary consultations between the client and the attorney regarding the attorney's possible retention.... All that is required ... is that the parties, explicitly or by their conduct, manifest an intention to create the attorney/client relationship.

*Nolan v. Foreman,* 665 F.2d 738, 739 n. 3 (5th Cir.1982) (citations omitted). The court in *Nolan* was applying Texas law, but the law in the District of Columbia is no different:

> It is well established that neither a written agreement nor the payment of fees is

---

**9.** Implicit in respondent's argument is that the Board was improperly swayed by the plight of the indigent aliens who testified against her.

**10.** The Board's decision is also consistent with the hearing committee's findings, which the Board must accept if they are "supported by substantial evidence in the record, viewed as a whole." *In re Micheel,* 610 A.2d 231, 234 (D.C. 1992) (citation omitted).

necessary to create an attorney-client relationship.... Furthermore, it is not necessary for an attorney to take substantive action and give legal advice in order to establish such a relationship.

*In re Lieber,* 442 A.2d 153, 156 (D.C.1982) (citations omitted). Because ethical responsibilities exist independently of contractual rights and duties, we hold that any supposed failure of a client to fulfill a retainer agreement is no defense to a disciplinary charge against an attorney.

■ Respondent also claims that the labor certifications and supporting documents are not the property of her clients but her own work product as an attorney. The Board rejected this argument and held that under Rules 1.16(d) and 1.8(i), "a client's right to documents exists when the client has a plausible ownership interest in them and there is no competing claim to their ownership." We agree with this interpretation of the rules.[11] Since the labor certification documents do not belong to respondent, and since her clients had a plausible and uncontested ownership interest in them, respondent was under an obligation to return them upon request.

## B. *Sanction*

■ "A recommendation of the Board ... with respect to a proposed sanction comes to us with a strong presumption in favor of its imposition." *In re Goffe,* 641 A.2d 458, 463 (D.C.1994) (citing *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc)). Thus we must "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C.Bar Rule XI, § 9(g)(1). While the ultimate choice of a sanction rests with this court, *Goffe,* 641 A.2d at 464, our rule requires us to "respect the Board's sense of equity in these matters unless that exercise of judgment

proves to be unreasonable." *In re Smith,* 403 A.2d 296, 303 (D.C.1979); *accord, In re Hutchinson, supra,* 534 A.2d at 924; *In re Alexander,* 466 A.2d 447, 452 (D.C.1983), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1680, 80 L.Ed.2d 154 (1984).

■ In determining what sanction may be appropriate under the circumstances, there are several factors that need to be considered. These include the nature of the violation, the mitigating and aggravating circumstances, the need to protect the public, the courts, and the legal profession, and the moral fitness of the attorney to the extent that we can discern it. *In re Hutchinson, supra,* 534 A.2d at 924 (citing cases); *accord, e.g., In re Goffe, supra,* 641 A.2d at 464. The purpose of imposing sanctions is not to punish the attorney, but "to serve the public and professional interests identified and to deter future and similar conduct...." *Id.*

■ Keeping these factors in mind, the Board looked to three cases that closely resemble this one in deciding what sanction to recommend: *In re Tinsley,* 582 A.2d 1192 (D.C.1990); *In re O'Donnell,* 517 A.2d 1069 (D.C.1986); and *In re Robertson,* 612 A.2d 1236 (D.C.1992). In *Tinsley* and *O'Donnell* this court ordered one-year suspensions, requiring in the former case a payment of restitution, and in the latter case proof of fitness before reinstatement. In *Robertson,* on the other hand, an attorney was suspended for four months with no requirement of either restitution or a showing of fitness. The violations in all three cases involved various combinations of neglect, intentional failure to seek the lawful objectives of a client, intentional failure to carry out a contract of employment, conduct prejudicial to the administration of justice, failure to maintain appropriate records, refusal to return client files, and intentional prejudice to a client. *See Tinsley,* 582 A.2d at 1192–1194; *O'Donnell,* 517 A.2d at 1069; *Robertson,* 612 A.2d at 1237.[12] The distinguishing factors

---

**11.** In reaching this conclusion, the Board, relying on Opinion No. 242 of the D.C.Bar Legal Ethics Committee, disagreed with the hearing committee's interpretation of Rules 1.16(d) and 1.8(i). The committee had read these provisions as requiring clear and convincing proof that the client "owned" the requested document. We find the Board's analysis more reasonable.

**12.** In *Tinsley* the attorney was also found to have violated DR 6–101(A)(1) (lack of competence). *See* 582 A.2d at 1192.

among the three cases were the pervasiveness, duration, and severity of the violations involved and the presence or absence of a prior disciplinary record.[13]

The record in this case clearly shows a pattern of neglect, intentional refusals to return client files and property, and intentional failures to seek clients' objectives. Even more serious is the manifest failure on the part of respondent to appreciate her ethical responsibilities. While respondent, like the attorney in *Robertson*, does not have a prior disciplinary record, the gravity and pervasiveness of her conduct affecting several clients over an extended period of time makes this case more serious than *Robertson*, which involved only a single client. We therefore impose a four-month suspension as in *Robertson*, but to it we add the requirements of restitution and a showing of fitness drawn from *Tinsley* and *O'Donnell.*

Accordingly, it is ORDERED that respondent, S. Anita Ryan, shall be suspended from the practice of law in the District of Columbia for four months, shall make restitution to her clients in the amounts specified by the Board (with the exception of the $110 that her client José Berrios has already received; see note 6, *supra* ), and shall prove her fitness to practice law before being reinstated. The restitution that we order shall also be a condition of reinstatement. *See* D.C.Bar Rule XI, § 3(b). The suspension shall take effect thirty days from the date of this opinion. *See* D.C.Bar Rule XI, § 14(f). We direct respondent's attention to section 14(g) of Rule XI, which requires the filing of an affidavit containing certain information within a specified time. *See also* D.C.Bar Rule XI, § 16(c).

---

**13.** In *O'Donnell* and *Tinsley,* as in this case, the attorneys engaged in multiple violations involving several clients over an extended period of time; however, in those cases the respondents also had been previously sanctioned. Conversely, in *Robertson* the respondent engaged in less severe violations involving only one client and had no prior record of misconduct.